UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LUNATREX, LLC, AIR BUOYANT, LLC, and PETER BITAR,<br><br>Plaintiffs,<br><br>v.<br><br>MARY A. CAFASSO, MC SQUARED, INC., and LUNATREX, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)  CASE NO. 1:09-cv-1272-DFH-DML<br>)<br>)<br>)<br>)<br>) |

ENTRY ON CROSS-MOTIONS FOR PRELIMINARY INJUNCTION AND
DEFENDANTS' MOTION TO DISMISS

The parties in this case were members of the "LunaTrex" team competing in the Google Lunar X Prize competition, which offers a prize of as much as $20 million for a private effort to land a robot on the surface of the moon. The LunaTrex team members have had a falling out. In this lawsuit, each side claims exclusive rights to the LunaTrex trademark and related intellectual property. Each side seeks a preliminary injunction under federal trademark law to block the other side from using the LunaTrex mark, particularly in the Google Lunar X Prize competition, which has suspended all of these parties from participating in the competition until this dispute is resolved.

The court heard evidence and argument on November 9, 2009 and now states its findings of fact and conclusions of law as required under Rules 52 and 65 of the Federal Rules of Civil Procedure. The court finds that it has personal jurisdiction over the defendants and that venue is proper in the Southern District of Indiana. The court finds that the LunaTrex trademark was in use in commerce when the team began publicizing its efforts to win the prize. The court also finds that plaintiffs are not likely to succeed on their claim that they own the LunaTrex trademark to the exclusion of the defendants. Instead, at this preliminary stage of the case, the court finds that the LunaTrex mark was developed and used by a de facto partnership or joint venture. All members of that partnership or joint venture are equally entitled to use the mark, and none are entitled to use it over the objections of the others. Unilateral use by either side poses a risk of confusion to the public, which is the principal focus of trademark law. The court therefore takes the unusual step of granting both sides' motions for a preliminary injunction. The parties will have to agree on a resolution before any of them may use the mark.[1]

---

[1]Because the court has before it only the limited record presented on the motions for preliminary injunction, the findings of fact and conclusions of law in this entry should be understood as preliminary and subject to correction or revision if additional evidence and argument are presented at later stages of this action.

*Findings of Fact*

In September 2007, the X Prize Foundation announced the Google Lunar X Prize competition.  The foundation said that it would pay prizes totaling $30 million, with a first prize of as much as $20 million for a private team that could land a robotic "rover" on the surface of moon and have the robot travel at least 500 meters and send high definition video and other data to Earth.  The announcement of the prize sparked interest among many experts in space exploration and was a hot topic of discussion during a conference in New Mexico in October 2007.

Defendant Mary Cafasso attended that symposium, and there she met Joseph Gangestad and Margaret Ratcliff.  Those three and others talked about the possibility of competing for the Google Lunar X Prize.  After the symposium, Ratcliff talked with her friend plaintiff Pete Bitar, a businessman in Indiana who had agreed to pay her expenses to attend the New Mexico symposium.  Bitar owned several businesses with interests in aerospace and other sophisticated technologies.  He knew Ratcliff through aerospace business organizations.  In October and November 2007, Ratcliff and Bitar talked about forming a team to compete for the X Prize.  They began to identify and recruit team members, including Greg Allison of High Altitude Research Corporation (HARC) and Joseph Gangestad of Orbit Frontiers, LLC.  In December 2007, Bitar contacted William

Pomerantz of the X Prize Foundation to say that he intended to form a team to compete in the Lunar X Prize competition.

As the discussions proceeded toward forming a team, Gangestad urged Bitar to contact Mary Cafasso to recruit her to join the still-unnamed and unformed X Prize team effort. Bitar sent an email to Cafasso in early January 2008 introducing himself and inviting her to talk about joining the team that was forming. Bitar and Cafasso had a long telephone conversation on January 14 or 15, 2008. Bitar invited Cafasso to travel to Indiana at his expense to join the team. Bitar hosted a meeting for team members at one of his businesses in Anderson, Indiana from January 30 to February 1, 2008. (Pomerantz of the X Prize Foundation had told Bitar of a planned kick-off event for the lunar prize competition in late February 2008. He encouraged Bitar to move quickly to send in a team registration in time to participate.)

One goal of the meeting was to choose a name. After a lengthy discussion of numerous ideas that evolved, the group eventually chose the name LunaTrex. (As will be seen, with the benefit of hindsight it is clear that the group also should have spent some more time talking about organization, structure, ownership, and other legal formalities.) As name ideas were discussed, Bitar had an employee of one of his companies (Air Buoyant) check those names to see if they were available for use in website domain names. On January 30th, Bitar had the employee

-4-

reserve the name lunatrex.com.  After the meeting, Bitar and his employee established and hosted the www.lunatrex.com website at Bitar's expense.

On January 31st, the newly named LunaTrex team completed and shipped a registration package to the X Prize Foundation.  The package included biographical information about team members, including Bitar, Cafasso, Gangestad, Allison, and others.  The registration package listed Pete Bitar as the "team leader," and Bitar paid the $10,000 registration fee himself.[2]

Sending a robot to the moon is an expensive venture.  None of the LunaTrex team members had the millions of dollars needed to fund the venture.  It was always clear that the team would need to operate on two tracks in parallel:  raising money and developing the lunar rover and rocket system that would be needed to win the X Prize.

Bitar brought business experience to the team.  He was also willing to fund out-of-pocket cash expenses of the team and other team members, such as the registration fee, travel expenses, and website expenses.  He hoped to be able to fund additional team efforts with profits he hoped to earn with another of his businesses working on defense contracts.  Those hopes were disappointed when

---

[2]Several key documents, including the registration package, were not actually offered as evidence during the hearing on the motions for preliminary injunction.  A later letter from the X Prize Foundation corroborates that Bitar was listed as team leader.  There is no evidence that anyone else paid anything toward the registration fee.

his other business did not win the contracts it hoped to.  Bitar also planned to raise money by finding sponsors who would support the effort in return for publicity.

Bitar does not himself have the technical expertise to design, build, and direct a rocket and lunar rover system needed to win the prize.  He viewed his role as pulling together the technical talent and resources needed to win the prize.  Other team members had technical and management expertise in various aspects of the overall system that would be needed to win the prize.

Mary Cafasso emerged as the "technical team leader" of the LunaTrex team.  Cafasso has about 25 years of experience with orbital operations and mission control with NASA and companies that operate communication satellites.  She also runs a consulting business, defendant MC Squared, Inc., through which she provides aerospace and satellite consulting services, including work as an expert witness in disputes over satellite and space losses.

After the LunaTrex team registered for the X Prize, one part of the team's work was to develop a logo (as required by the X Prize Foundation).  Bitar hired a marketing group to work on logo ideas and artwork, and the brother of one of the HARC principals worked as a volunteer to provide some logo ideas.  By April 21, 2008, the team had agreed on a final version of the LunaTrex team logo, one that was very similar to the one designed by the brother of the HARC

principal.[3]  Bitar then quickly arranged to have that logo used on the X Prize website for the competition, on the LunaTrex team's own website, and on business cards and other promotional items (including 1000 small rubber "squeeze balls" to relieve stress, painted and shaped like the moon, with the LunaTrex logo printed on it).  Team members, including Cafasso, distributed their LunaTrex business cards (and the squeeze balls) widely among space and aerospace businesses in the United States and Europe.  The name and logo were used in numerous contacts with the news media to publicize the team's efforts.  Bitar has provided staffing for the LunaTrex website by assigning an employee of Air Buoyant to tend the site and its contents.  The website hosted by Bitar and Air Buoyant in Indiana was also used for email communication among team members.

From February 14 to 17, 2008, the new LunaTrex team met in Huntsville, Alabama (home of HARC) to address financial and organizational issues.  Cafasso testified that at this meeting, Bitar asked for and received her oral commitment to work 30 hours per week on LunaTrex, and that Bitar committed orally to pay her a salary.  The evidence presented thus far shows, however, that they never actually agreed on an amount or a time or on the conditions that would trigger an obligation for Bitar to pay Cafasso.

_____

[3]The final version features an image of the moon showing its surface features.  A small and distant earth is behind and to the right of the image of the moon, and a "swoosh" indicates a trajectory from the earth around the moon.  The letters "Luna" appear in white over the image of the moon, and the letters "Trex" appear in black slightly below and to the right of the image of the moon.

The X Prize Foundation expected the competing teams to post at least weekly updates on a blog feature of the foundation's website.  In February 2008, Bitar began posting blog entries for the LunaTrex team on the foundation website, and he posted similar materials on the team's own website.  Cafasso also had codes that allowed her to post on the blog, but she rarely did so.

On February 20-21, 2008, the X Prize Foundation held a publicized meeting at Google's headquarters in California to launch the Lunar X Prize competition. Bitar and four other team members attended for LunaTrex.  Bitar spoke for the team at public events.  He also paid the travel expenses for the other team members.

In May 2008, the X Prize Foundation held another meeting in Strasbourg, France.  Bitar could not attend for the team, but Cafasso could and did attend. Her trip also included a meeting with another X Prize team in Milan, Italy.  Bitar personally paid for Cafasso's travel expenses of nearly $10,000.

In June 2008, Bitar learned that a defense contract he had hoped to win would not be awarded to one of his businesses.  This disappointing news meant that Bitar would not have the supply of significant new funds that he had planned to use to help fund the LunaTrex team.  He informed team members of this bad news.  According to Bitar, all agreed to continue to work as volunteers toward the goal.

At about the same time, in June 2008, the Lunar X Prize website sponsored a "poll" in which visitors were invited to vote for their favorite team from among the 12 registered teams.  The poll attracted several hundred votes.  LunaTrex came in first with 65 percent of the votes cast.  (Bitar believes that many of the votes were cast by people acquainted with him.)

In September 2008, the LunaTrex team met again in Bowling Green, Kentucky.  Just before the meeting, Cafasso flew to Indiana to meet with Bitar to plan for the upcoming meeting, and there was some discussion of compensation issues.  The evidence indicates that Bitar and Cafasso discussed this subject over many months but never agreed to any specific terms that would balance an equity interest in the team with some form of salary for Cafasso.  No other team members have asserted a right to be paid by Bitar for their time.  Bitar paid for hotel rooms and meals for the team members who attended the Bowling Green meeting.

In the course of the September 2008 meeting in Bowling Green, the team members talked about incorporating but chose not to do so yet.  The team had no revenues, and Bitar wanted to minimize overhead costs, including those associated with a legal organization for the team.  Bitar was covering out-of-pocket expenses for the team by having Air Buoyant write checks to cover them, and he reimbursed Air Buoyant from his personal bank accounts.  At the Bowling Green meeting, the LunaTrex team members signed non-disclosure agreements.  The evidence includes such an agreement signed by both Bitar and Cafasso.  Bitar

himself adapted the agreement from similar agreements he has used in several businesses.  See Ex. 3.  The tricky problem with the agreement lies in trying to figure out who is contracting with whom.  The agreement begins:

> In connection with your consideration of a [possible investment, purchase of equipment, license agreement, or working relationship or consultancy] in Air Buoyant, LLC ("LunaTrex" or the "Company"), it is expected that we will furnish you with certain confidential, proprietary, or non-public information about the business and operations of LunaTrex.  This information will include the ideas comprising LunaTrex, pursuing the Lunar XPRIZE and other core business model components.

Ex. 3.  The agreement was signed on September 20, 2008 by Mary Cafasso as president of MC Squared, Inc., and by Pete Bitar on behalf of "LunaTrex, LLC," an entity that would not exist for another year.

In December 2008, Bitar and Cafasso traveled to California to meet with the X Prize Foundation and other teams at a "summit" that addressed the competition rules, among other subjects.  Bitar prepared a powerpoint presentation on the team's progress.  He gave Cafasso an opportunity to review the presentation shortly before he made it.  She believed it included inaccurate information and confidential information.  On this limited record, it is unclear whether, when, and how she raised those issues with Bitar or how they were resolved.

The next in-person team meeting for LunaTrex took place in Anderson, Indiana in February 2009.  The record reflects little or nothing about what happened then.  In March 2009, Bitar and Gangestad attended a conference in

Chicago sponsored by the International Events Group.  The conference was intended to bring together potential sponsors and groups or events seeking sponsors.  Bitar paid the entrance fee, travel expenses for himself and Gangestad, and other related expenses for a total of more than $12,000.

At the Chicago conference, Bitar got acquainted with Roger Phelps of the Stihl Corporation, a manufacturer of chain saws and other outdoor equipment. Bitar told Phelps about the LunaTrex team's participation in the Google Lunar X Prize competition, and Phelps expressed interest in possibly having the Stihl Corporation sponsor the team.  Phelps eventually invited Bitar to make a presentation at Stihl's U.S. headquarters in Virginia regarding a possible sponsorship.  Bitar traveled to Virginia and gave a presentation on April 16, 2009.

Bitar prepared the presentation by working from the powerpoint presentation from the December 2008 X Prize event.  The day before he gave the Stihl presentation, he sent an electronic draft to Cafasso, far too late in her view to provide adequate review.  She suggested some minor corrections, but she was also troubled by the budget estimates that Bitar provided to Stihl.  She believed they were very optimistic, to the point of being unrealistic and even deceptive.  She believed that if those estimates were to become public and were associated with her, it would hurt her professional reputation.

For the presentation to the Stihl Corporation, Bitar took with him a model of a lunar rover design being developed by scientists at the University of Minnesota.  In one of the stranger twists in this whole story, the LunaTrex team had hurried to negotiate a contract with the University of Minnesota to examine the model for five days, subject to confidentiality agreements.  Because there was no legal entity called LunaTrex, the University of Minnesota obtained confidentiality agreements with Cafasso's company, MC Squared, Inc., and Bitar's company, Air Buoyant.[4]

The presentation was well received by Phelps and others at the Stihl Corporation.  Phelps told Bitar that Stihl intended to sponsor the LunaTrex team by providing nearly $1 million over the next three years (2010 to 2012), subject to finalizing a sponsorship deal in October 2009.  Bitar was delighted.  He told Cafasso and other team members of this sponsorship, which was an important forward step for the LunaTrex team.  Although much more money would be needed to win the prize, the money from Stihl would be a big help, and Stihl's cash and sponsorship would also help to establish credibility with other potential sponsors.  According to Bitar, Cafasso's first response to the news of the sponsorship was:  "So when do I get paid?"  Bitar did not believe that the Stihl money, which would not be available until 2010, would be enough to start paying

---

[4]The current record does not indicate whether the University of Minnesota team agreed to allow Bitar to use the model in his presentation to the Stihl Corporation, whether Bitar told Stihl about any connection with the University of Minnesota, or whether Bitar's use of the model was consistent with the terms of the confidentiality agreements with the university.

salaries to team members, including Cafasso.  He told Cafasso that there was not enough money available yet to begin paying her for her work on the LunaTrex team.  Bitar also believed that the Stihl money could not all be used for technology purchases and development; some would be needed to secure other sponsorships.

In early 2009, before the Chicago conference and the meeting with Stihl, Cafasso had begun expressing her dissatisfaction with Bitar's leadership of the LunaTrex team.  She first voiced these concerns to Joseph Gangestad.[5]  After the Stihl meeting and the likely sponsorship became clear, she began expressing these concerns more widely in emails to other team leadership members, including Bitar himself.  She criticized his lack of relevant experience with aerospace operations. The record does not include many of these email communications, but it is clear that they provoked a crisis in the LunaTrex team.  The emails included messages from Cafasso on May 14th and May 15th reporting on her research on where and how it would be best to incorporate LunaTrex.  She favored incorporating in Nevada.  On May 26, 2009, Bitar sent an email to Cafasso, Gangestad, and Allison responding to Cafasso's criticisms.  He concluded by saying:

---

[5]Part of the disagreement concerned where to locate the team's "mission control" facility.  Bitar had offered the basement of a building that he was planning to build in Anderson, Indiana, and Gangestad and Cafasso expected that Bitar would make the building available for free.  Bitar later indicated that he would expect the mission control facility to pay the mortgage for the building, which made the offer much less attractive to other team members, so that Cafasso and Gangestad thought the team should establish a facility in another part of the United States.

> Bottom line is, if you do not want to buy me out of LunaTrex, then I will simply pull the funding, get back my entry fee (paid by Air Buoyant), and withdraw LunaTrex from the GLXP, and then start my own team.  I will take Stihl with me, and they will understand.  We have come to an impasse that I cannot see a solution to.

Ex. 34.

In the first week of June 2009, the crisis came to a boil, and Bitar and Cafasso both took independent steps to secure for themselves control of the LunaTrex team and trademark.  On June 3, 2009, Cafasso filed incorporation papers in Nevada for LunaTrex, Inc., which has also been named as a defendant in this action.  On approximately June 3rd or 4th, Bitar instructed his attorneys to submit a trademark application to register the LunaTrex trademark.  (The application was received and filed on June 8, 2009.) The Bitar application claimed first use in commerce on January 30, 2008 when the lunatrex.com website name was reserved, just before the team sent in its registration package for the prize. Cafasso did not tell other team members about her action, and Bitar did not tell others about his.[6]

On June 7, 2009, Cafasso, Bitar, Gangestad, and Greg Allison were all in West Lafayette, Indiana for a wedding.  The four members of the leadership team agreed to meet on that Sunday afternoon before Allison had to return to Alabama.

---

[6]One exception to this point is that Cafasso told Gangestad about the new Nevada corporation on June 6th, the day before the critical meeting.  Neither mentioned this development to Bitar during the meeting the next day.

Bitar, Gangestad, and Cafasso all testified about the meeting.  Based on their differing accounts, the court finds that Gangestad and Allison started out acting as mediators between Bitar and Cafasso.  Cafasso attacked Bitar for his decisions about spending his own money on the team.  Cafasso asserted that she was the team leader.  After a time, Gangestad shifted from his role as a mediator and became more of an advocate for Cafasso.

At the end of the meeting, there was no resolution.  Bitar offered to step down from the team on conditions that were not acceptable to Cafasso, including having the team reimburse him for all of the money he had spent on it.  At some point near the end of the meeting, Bitar said he would just take his money, close up LunaTrex, and start his own team.  Cafasso said, "Do it," and Bitar said, "I will."  See Ex. 35 (Gangestad's contemporaneous notes).

The night after the meeting, however, Bitar sent an email saying that he was not walking away from the team.  See Ex. 36.  In the court's view, it is unlikely that Bitar simply resigned unconditionally from the team that he had done so much to promote.  It is also unlikely that he merely abandoned his investment of money and time to others who did not appreciate his contributions.  The more plausible interpretation of what happened at the meeting is that Bitar offered a condition that he expected would be unacceptable to others, though it would have been tolerable to him:  a refund of all of his cash contributions to the team.  Whatever exchange occurred near the end of the June 7th meeting, the court finds

that there was no clear resignation by Bitar (as opposed to a threat or a negotiating position) and certainly there was no clear resolution of ownership of the team's trademark, its registration and fee with the Lunar X Prize competition, and other intellectual property.

After the meeting and after she incorporated LunaTrex, Inc. in Nevada, Cafasso then moved to register the LunaTrex trademark on behalf of the new corporation.  Her application was filed on June 17, 2009.  The application asserted only an intent to use the trademark in the future in commerce.  Cafasso told only Joseph Gangestad about this application, not any other team members.  Some time in June 2009, Cafasso also sent a check for $10,000 to the X Prize Foundation.  She had left the June 7th meeting under the impression that Bitar was quitting the venture and would be asking the foundation for a refund of the $10,000 entrance fee he had paid for the LunaTrex team.  Cafasso wanted to make sure that there was no lapse in the team's good standing with the foundation.  (The record does not indicate what has happened to Cafasso's check.  Bitar has not asked for his money back.)

As far as this record reflects, the next several months were strangely quiet.  Then, on September 14, 2009,  Cafasso's attorney sent a series of letters asserting that Cafasso was in charge of the LunaTrex team and trademark.  The first letter was to Roger Phelps at the Stihl Corporation.  Ex. 7.  The letter to Phelps said that Bitar had made misleading and incorrect representations to Stihl, including some

made in his presentation on April 16th.  The attorney sent similar letters to Lesa Ukman, the chair of the International Events Group (which had organized the conference where Bitar had made the connection with Phelps and Stihl Corporation), Ex. 8, to Greg Allison of HARC, Ex. 9, and to the X Prize Foundation (not in the record).  The attorney sent a similar letter to Bitar on September 17, 2009, with the added twist that he demanded that Bitar pay Cafasso for her work on the team.

The effects of these letters were predictable and immediate.  On September 17th, Phelps sent an email to Bitar stating that the Stihl Corporation felt it had to suspend further discussions of possible sponsorship until the dispute between Bitar and Cafasso was resolved.  Because of Stihl's annual cycle for making decisions about such expenditures, that suspension of talks is likely to remove any possibility of sponsorship before 2011.

Also, on October 9, 2009, the X Prize Foundation sent a letter to both Bitar and Cafasso saying that the dispute between them put the foundation in "an untenable position" and that the LunaTrex team was suspended effective immediately.  Ex. 11.  During the suspension, the team would not be allowed to blog on the X Prize website, user accounts would be suspended, and the team would not be allowed to attend the team summit meeting.  The foundation said that the suspension would remain in effect until it received clear evidence of ownership of the LunaTrex name and the team's registration and a clear

statement of who is authorized to speak for the team.  The foundation noted "that in the original (and only) registration that we received from Team LunaTrex, Pete Bitar was identified as the point of contact and team leader."  If Cafasso was claiming that she was authorized to speak for the team, the foundation needed evidence showing the basis upon which Bitar was removed and his replacement was appointed.  If these conditions are not satisfied by December 31, 2009, the foundation said, the LunaTrex team will be removed from the competition and the original registration fee will be returned "to the party that originally submitted it" (Bitar or his company, Air Buoyant, LLC).  The foundation also said that it would not make any public statement regarding the suspension of the LunaTrex team.

Bitar filed organization papers on September 18, 2009 for LunaTrex, LLC in Indiana.  On October 8, 2009, Bitar filed a response to an office action by the Patent and Trademark Office regarding his June 2009 application to register the LunaTrex trademark.  Ex. 5.

Plaintiffs Pete Bitar, Air Buoyant, LLC and LunaTrex, LLC filed this lawsuit on October 9, 2009, the same day that the X Prize Foundation sent its letter. They named as defendants Mary Cafasso, MC Squared, Inc., and LunaTrex, Inc., the Nevada corporation.  The complaint asserts claims for federal trademark infringement and unfair competition under the Lanham Act, Indiana trademark infringement and unfair competition, as well as copyright infringement, breach of contract, tortious interference with business relationship, tortious interference

with contract, and attempted conversion.  Plaintiffs seek a determination that they own the LunaTrex trademark and an injunction against defendants' continued use of the LunaTrex name and confidential information.  Plaintiffs filed their motion for a temporary restraining order and preliminary injunction on October 19, 2009. The motions judge deferred ruling on the motion for a temporary restraining order until the preliminary injunction hearing could be held.

Defendants have responded by moving to dismiss for lack of personal jurisdiction, improper venue, and forum non conveniens.  In the alternative, defendants moved for their own preliminary injunction against plaintiffs to prevent them from using the LunaTrex trademark and confidential information.

*Conclusions of Law*

I.    *Personal Jurisdiction and Venue*

Federal trademark law does not provide for nationwide service of process. The plaintiffs must show that the defendants are subject to personal jurisdiction in the chosen Indiana forum.  See *Nerds on Call, Inc. v. Nerds on Call, Inc.*, 598 F. Supp. 2d 913, 915 (S.D. Ind. 2008).  The evidence here shows ample grounds for exercising personal jurisdiction over defendants in this case.  The defendants do not have contacts with Indiana sufficient to support general jurisdiction, but they clearly have sufficient contacts to support specific jurisdiction in this lawsuit arising from those contacts.  Cafasso (as an individual and on behalf of her

company MC Squared, Inc.) traveled several times to Indiana in connection with the LunaTrex venture.  She entered into an informal but long-term relationship with Indiana persons and entities who were also part of the LunaTrex team, including Bitar, Gangestad, Ratcliff, Air Buoyant, and Orbit Frontiers.  The trademark and other claims arise directly out of those contacts between the parties.  It is not unfair to subject these defendants to jurisdiction in this district.  See generally *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479-80 (1985) (affirming exercise of jurisdiction over foreign defendant who had entered into long-term contractual relationship with party in forum state).

Venue is also proper here.  When this court's jurisdiction arises from a federal question, venue is proper where a substantial part of the events giving rise to the claim occurred.  See 28 U.S.C. § 1391(b); *Askew v. Sheriff of Cook County*, 568 F.3d 632, 636 (7th Cir. 2009).  Here, the plaintiffs' claims arise at least in substantial part from events occurring in Indiana.  Defendants correctly point out that venue would also be proper elsewhere, such as in their home states of Arizona or Nevada, or perhaps California (where the Google Lunar X Prize is headquartered) or Alabama (where LunaTrex team member HARC is located).  The fact that venue also would have been proper in other districts does not make it improper in this one.  See *Armstrong v. LaSalle Bank Nat'l Ass'n*, 552 F.3d 613, 617 (7th Cir. 2009) (venue may be proper in more than one court).

To the extent that there is a separate forum non conveniens argument, it has no merit here.  Cafasso traveled to Indiana frequently to meet regarding LunaTrex team business.  She traveled all over the United States and Europe on team business, and she hired a lawyer from New Jersey, which is much farther from her home base in Arizona than Indiana is.  It is not unreasonable or unfair to expect her to participate in a lawsuit here directly related to those activities.

Defendant LunaTrex, Inc. did not exist until June 2009, but the foregoing reasoning applies to the new corporation, as well.  Cafasso established the new corporation for the purpose of capturing the work and property of the LunaTrex team, and she testified that she listed the incorporating shareholders as the four principal team members, including two Indiana companies, Air Buoyant and Orbit Frontiers.  The letters sent by Cafasso's and the company's lawyer in September 2009 were intended to cause effects in Indiana and were aimed against Bitar and Air Buoyant in Indiana.  See *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd.*, 34 F.3d 410, 412 (7th Cir. 1994) (affirming exercise of jurisdiction over defendant that planned to use trademark in way that would cause harm Indiana).  In short, the case is properly before this court.  Defendants' motion to dismiss is denied.

II.     *Preliminary Injunction*

To win a preliminary injunction, a moving party must show (1) a reasonable likelihood of prevailing on the merits of the claim and (2) a threat of imminent irreparable harm.  If the moving party meets those requirements, the court must then (3) weigh the threat of irreparable harm to the moving party against the risk of harm to the enjoined party and (4) consider the public interest, including the interests of those not before the court.  See *Joelner v. Village of Washington Park*, 378 F.3d 613, 619 (7th Cir. 2004), citing *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir. 1994).  An injunction must also be secured by suitable security under Rule 65(c) of the Federal Rules of Civil Procedure to protect the interests of the enjoined parties from harm caused by an erroneous injunction. *Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002).

In this case, the decisive factor for both sides' motions is the likelihood of success on the merits.  Each side's motion indicates correctly that the alleged infringement of the LunaTrex trademark would cause irreparable harm to any party actually entitled to control its use.  See Dkt. No. 14, at 21-22; Dkt. No. 24, at 1.  The threat of being disqualified from the Google Lunar X Prize competition is sufficiently immediate and irreparable to justify injunctive relief in favor of any party entitled to use the trademark and name.  The mirror-image motions indicate that the balance of harms is essentially a draw.  The public interest depends here on the likelihood of success on the merits, but there is also a public interest in avoiding confusion that leads the court to grant both sides' motions rather than to deny them both.

A.    *Use in Commerce*

When Cafasso filed to register the LunaTrex trademark in June 2009, she filed for intended future use of the trademark in commerce.  She argues that Bitar and the LunaTrex team had never used the trademark "in commerce" before she filed to register the mark, so she relies upon the priority of her filing.  Bitar and the other plaintiffs contend that they began using the LunaTrex trademark in commerce as early as January 30 or 31, 2008 when the team agreed on the name and submitted its registration to the Google Lunar X Prize organizers.  Plaintiffs contend that they continued to use the mark in commerce in promoting the LunaTrex team and its participation in the competition.

Under the Lanham Act, a trademark can be registered and is otherwise protected when it is used in commerce.  See 15 U.S.C. § 1051(a)(3)(C), (d).  The Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in the mark."  15 U.S.C. § 1127.  Sales using the mark are one excellent example of use in commerce, but sales of goods and services are not necessary to show use in commerce.  *E.g.*, *Johnny Blastoff, Inc v. Los Angeles Rams Football Co.*, 188 F.3d 427, 434 (7th Cir. 1999).  As the court explained in *Johnny Blastoff*, the court and the mark owner "may rely on the use of the mark in 'advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications.'"  *Id.*, quoting *T.A.B. Systems v. Pactel Teletrac*, 77 F.3d 1372, 1375 (Fed. Cir. 1996).  Such non-sale uses of a

trademark amount to "use in commerce" because they serve "the purpose of establishing public identification of a mark with a product or service." *Id.*; *see also Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 485 (7th Cir. 2007) (use must be "enough to seize the attention of the relevant market" and to "alert any significant number of consumers" that the mark has "a definite referent"); *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992) (sales not required, but use forces mark owner to "link the . . . mark with [the] product in the minds of consumers" and to "put other producers on notice" that they should not use the same mark).

Plaintiffs have shown that the LunaTrex team was using the mark in commerce at least as early as February 2008, when the team used the mark to designate its entry in the Google Lunar X Prize competition.  That use was sufficiently prominent to seize the attention of the small relevant market of participants in the competition and those following it.  The use was sufficient to alert interested persons that the mark had a definite referent, the LunaTrex team. After the publicity concerning the new team in February 2008, the team expanded its use of the mark to publicity in advertising brochures, the squeeze balls, in many conferences and symposiums all over the United States and in Europe, and in efforts to seek sponsors to support the team's entry.  Different team members used the mark in different ways and at different times and places, but all of them used the mark to refer to the same thing:  the LunaTrex team and its entry in the Lunar X Prize competition.  The use was genuine and continuous; there is no

indication here that the LunaTrex team was merely seeking to reserve the mark for some future use.  Plaintiffs have shown that the LunaTrex mark was used in commerce and thus protected under the Lanham Act long before Cafasso tried to register the mark in June 2009.  Defendants therefore are not likely to prevail on the theory that they were the first to try to register the mark.

B.    *Ownership of the Trademark*

Because the LunaTrex mark was created by use in commerce in 2008 rather than by registration in 2009, the decisive question here is who owns that mark. Normally the parties' agreement would resolve that question, but here the team members did not sign an agreement or form a legal entity to act as the owner of the team's assets, including its trademark.  In the absence of such an agreement, and in light of all the evidence submitted thus far, the court finds that the entire team owns the mark as a de facto partnership or joint venture.  Consequently, each team member is harmed when an entity other than the entire team uses the mark.  Each team member has the right to put a stop to any use by an entity other than the entire team.

The basic problem here is one that has arisen often in trademark law:  a loose and informal group of people start a new band or another new venture, establish a new and valuable trademark, and then have a falling out.  In the

absence of a formal agreement, how does a court decide who controls the trademark?

Courts have taken different approaches to the problem, keeping in mind the core purpose of identifying for the public the origin of the goods or services in question, as Judge Kaplan explained in a thoughtful opinion in *Liebowitz v. Elsevier Science Ltd.*, 927 F. Supp. 688, 696-98 (S.D.N.Y. 1996) (denying motion for summary judgment regarding ownership of scholarly journals' trademarks). In the context of music groups, courts try to identify which party made the most valuable contribution to the mark's value and award trademark ownership rights to that party. *E.g.*, *Bell v. Streetwise Records, Ltd.*, 640 F. Supp. 575, 580-82 (D. Mass. 1986) (discussing several similar cases). Other courts have treated such informal cooperative efforts as joint ventures or de facto partnerships or associations and held that the rights may be exercised only by the group as a whole. See *Durango Herald, Inc. v. Riddle*, 719 F. Supp. 941, 951-52 (D. Colo. 1988) (holding that neither party in dissolved joint venture was entitled to use trademarks without consent of the other); see also *Cash v. Brooks*, 1996 WL 684447, at *17 n.15 (E.D. Tenn. Apr. 24, 1996) (suggesting possibility of de facto partnership analysis, and holding that current users of band name had rights superior to band members who had left the band decades earlier and had not used the name in the interim); *Boogie Kings v. Guillory*, 188 So.2d 445, 448-49 (La. App. 1966) (holding that band was unincorporated association run for many years by majority rule).

A commentator recently proposed a multi-factor test designed to preserve what she sees as the three most important interests:  contractual expectations, responsibility for the quality of the goods or services, and consumer perceptions. See Pamela S. Chestek, *Who Owns the Mark?  A Single Framework for Resolving Trademark Ownership Disputes*, 96 The Trademark Reporter 681, 701 (2006).  In this case, there are no contractual expectations, the parties shared responsibility for the quality of services, and there is no clear indication of any consumer perceptions associating the LunaTrex name with one side instead of the other.

This court need not and will not attempt to offer a comprehensive theory for such problems to decide this preliminary injunction case.  The evidence before the court indicates that the LunaTrex team amounted to a joint venture or de facto partnership with at least four partners:  Air Buoyant, LLC, MC Squared, Inc., Orbit Frontiers, LLC, and High Altitude Research Corporation.[7]  Those four companies are associated with Bitar, Cafasso, Gangestad, and Allison, respectively, and those four people were the leadership team of the LunaTrex team.  Each team member contributed substantially to the team's efforts and reputation.  Because there is no contractual agreement governing the membership

---

[7]The court does not list these four partners to the exclusion of all others, but the preliminary injunction evidence focused on those four and their leadership roles.  Further evidence might indicate that other members of the LunaTrex team, such as Margaret Ratcliff, also used and contributed to the creation of the mark. The court's reasoning here would apply to any member of the team who contributed to the establishment of the mark and helped to create its value.

and legal control of the team's assets, the name or trademark is best treated as the asset of a de facto partnership.

The plaintiffs, however, contend that they alone own the mark.  They rely on the roles that Bitar and Air Buoyant played in developing and then exploiting the mark:  Bitar paid the out-of-pocket expenses incurred in developing and exploiting the mark.  He used the mark in his efforts to publicize the team and to seek sponsors.  Bitar was also identified as the team leader and spokesman in the team's Google Lunar X Prize registration package and on the X Prize website.

Without diminishing at all Bitar's significant contributions to the team, including bearing most of the out-of-pocket expenses, the problem with the plaintiffs' theory is that the entire team contributed to the creation of the mark's value and protected status.  Awarding control of the mark to the plaintiffs alone would ignore the contributions that the rest of the team made to the value of the LunaTrex name.  Perhaps most important, awarding sole ownership to the plaintiffs would require the court to conclude that Bitar and Air Buoyant had made such visible and disproportionately valuable contributions to the team's efforts that the relevant public associates the LunaTrex name with Bitar and Air Buoyant to a much greater degree than with any other team members.  The evidence here simply will not support such a conclusion.

Bitar played a key leadership role for the team, but he is not the only person to have done so. Bitar paid for most of the advertising or promotional activities. He was identified as team leader, but the promotional materials appear to have focused on the team as a whole. They certainly did not suggest that Bitar was the technical leader or otherwise had an exceptionally prominent role in the team. He was not personally responsible for inventing the mark or affixing it to any promotional materials; those were team efforts in the January 2008 meeting and later meetings. None of the team members put their own names on the team or its promotional materials. No one team member appears to have had principal responsibility for maintaining the quality and uniformity of the team efforts, and Cafasso was the technical team leader. There is no evidence that the relevant public believes that any one team member in particular stood behind the LunaTrex team and the quality of its effort.

Bitar seems to argue that the fact that he laid out the cash gives him the strongest claim to the LunaTrex mark. His payment of those expenses is surely an important factor, but it is not the only factor. Cash is not the only way to contribute to the team effort. Cafasso devoted a great deal of time and talent to the effort, as did other team members. Gangestad estimated that he had spent roughly 1000 hours on LunaTrex business. Cafasso estimated that she had spent roughly 2500 hours on LunaTrex business. There is no evidence here that team members thought that Bitar was entitled to special prominence and individual rights to the trademark.

On this record, therefore, it appears that the LunaTrex trademark belongs to all members of the team.  None of the four members of the leadership team – Bitar's Air Buoyant, Cafasso's MC Squared, Gangestad's Orbit Frontiers, or Allison's High Altitude Research Corporation – is entitled to use the mark to the exclusion of any of the others.

Several courts have pointed out in similar disputes among members of dissolved joint ventures or partnerships that the rivals are not both allowed to continue using the trademark of the dissolved joint venture or partnership.  See *Bell v. Streetwise Records, Ltd.*, 761 F.2d 67, 75-76 (1st Cir. 1985) (Breyer and Coffin, JJ., concurring) (reversing district court order that left both sides free to use disputed trademark name for musical group); *Liebowitz*, 927 F. Supp. at 696 (stating that if source of scholarly publications was neither uniquely the plaintiff's nor the defendant's, but some combination of their joint efforts, then public would be confused by either party's independent use of the trademark); *Durango Herald*, 719 F. Supp. at 951-52 (holding that neither party to joint venture was entitled to continue using trademark without consent of the other).  The result on this record is that neither side is entitled to use the LunaTrex trademark without the permission of the other.

The original LunaTrex team is no longer operating as a de facto partnership, and it seems to have broken up permanently.  Typically, when a partnership breaks up, the assets are distributed among the partners.  A trademark, however,

is not divisible.  If it were shared among the different splintered partners, the resulting confusion would destroy the value that each partner worked so hard to create.  Organizers of the Google Lunar X Prize are well aware of this risk and seem committed to preventing this confusion:  they say they will disqualify the entire team if this dispute is not resolved, and they will not allow two "LunaTrex" teams to compete.  Both plaintiffs and defendants have shown that they have an ownership interest in the mark and a right to veto unauthorized uses of the mark. Neither side has shown that it is likely to succeed in showing that the other side is not equally entitled to use the mark.  To prevent confusion to the public, the best solution under the law is to prevent all parties from using the mark without the consent of all other parties who are entitled to share control of its use.  In other words, the court will take the unusual step of granting each side's motion for preliminary injunction to prevent the other from using the LunaTrex trademark without the moving side's consent.[8]

C.    *Confidential Information and Non-Disclosure Agreements*

Neither side has shown it is likely to prevail on any theory that the other side has a duty to maintain the confidentiality of information regarding the LunaTrex team's effort to win the Lunar X Prize.  The partners brought their own talents to the effort.  They are free to use their talents in any direction they choose

---

[8]Nothing in this decision would necessarily prevent the parties from resolving the dispute by agreement, so long as they can avoid confusion for the relevant public as to the origin of an ongoing LunaTrex effort.

at this point, including continuing to compete for the prize under other names (absent agreement on use of LunaTrex).  Unlike the indivisible trademark, the partners are free to make use of their knowledge as individuals or in new teams. Plaintiffs have withdrawn their request for injunctive relief that would prevent defendants from competing for the Lunar X Prize.  Plaintiffs have also withdrawn their request for injunctive relief to restrict defendants from using confidential team information.  To the extent that plaintiffs attempted to reserve a right to argue that there remains some narrow category of protectable information, the court rejects the argument.  There is not even a coherent contract imposing such an obligation, and the de facto partnership should be deemed dissolved at this point.

D.   *Security*

Rule 65(c) of the Federal Rules of Civil Procedure requires a party who obtains a preliminary injunction to provide suitable security to protect the enjoined party from harm that might result from an erroneous injunction.  The principal tangible risk at this point from an erroneous injunction would be potential loss of the $10,000 entry fee in the Lunar X Prize competition.  Each side will need to post security in the form of $10,000 cash or a suitable bond as a condition of keeping in force the injunction preventing the other side from using the LunaTrex name and trademark.

*Conclusion*

The court will issue a preliminary injunction against all parties to this action enjoining them from any use of the LunaTrex name, trademark, or logo pending a final resolution of this action or other order of the court.  No later than seven calendar days after issuance of this injunction, plaintiffs must post security in the amount of $10,000 to make the injunction enforceable against defendants, and defendants must post security in the same amount to make the injunction enforceable against plaintiffs.


So ordered.

Date: December 1, 2009

_____
David F. Hamilton, Judge*
*Circuit Judge, sitting by designation

Copies to:

William Calvert Davisson
DAVISSON & DAVISSON, P.C.
owgob@davissonlaw.com

Luke P. Levasseur
MAYER BROWN, LLP
llevasseur@mayerbrown.com

Charles Novins
THE LAW OFFICES OF CHARLES NOVINS
ocnjlaw@gmail.com

John D. Ritchison
RITCHISON LAW OFFICES
jdritchison@comcast.net